**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **ALLEN SPRADLING**, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| **SURGICAL CARE AFFILIATES, LLC, SCAI HOLDINGS, LLC, ANDREW HAYEK, UNITEDHEALTH GROUP, INC., UNITED SURGICAL PARTNERS HOLDING COMPANY, INC., UNITED SURGICAL PARTNERS INTERNATIONAL, INC., TENET HEALTHCARE CORPORATION, and JOHN DOES 1-10,** | |
| Defendants. | |

Plaintiff Allen Spradling, on behalf of himself and all others similarly situated, brings this Class Action Complaint against Defendants Surgical Care Affiliates, LLC, SCAI Holdings, LLC, and Andrew Hayek (collectively "SCA"); UnitedHealth Group, Inc. ("United"), United Surgical Partners Holding Company, Inc., United Surgical Partners International, Inc., and Tenet Healthcare Corporation (collectively "USPI"); and John Does 1-10 ("Does"), for violations of Section 1 the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15(a), as follows:

**INTRODUCTION**

1. SCA, United, USPI, and Does (collectively "Defendants") agreed not to compete for each other's senior-level employees in the United States, refraining from soliciting or hiring employees absent the knowledge and consent of their existing employers. Defendants' conduct is

1

a per se violation of Section 1 the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15(a). These "no-poach" or "no hire" agreements (collectively "no poach agreements") began no later than 2010 and continued through at least 2017. Defendants' most senior executives entered into, monitored and enforced these agreements.

2.   Defendants' no-poach agreements were not necessary to any legitimate business transaction or lawful collaboration among the companies. Defendants' conspiracy was strictly a tool to suppress their senior-level employees' compensation, thereby reducing their own expenses.

3.   Defendants' no-poach agreements accomplished their purpose. The agreements reduced competition for Defendants' senior-level employees and suppressed Defendants' senior-level employees' compensation below competitive levels. The conspiracy disrupted the efficient allocation of labor that would have existed if Defendants had competed for, rather than colluded against, their current and prospective senior-level employees.

4.   Defendants' agreements also denied their senior-level employees access to job opportunities, restricted their mobility, and deprived them of significant information that they could have used to negotiate for better compensation and terms of employment.

5.   Defendants' conspiracy was initially revealed publicly on January 7, 2021, when the United States Department of Justice ("DOJ") issued a press release announcing a criminal indictment against SCA, which detailed the conspiracy. That indictment references two co-conspirator companies—"Company A" and "Company B." *See Indictment, United States v. Surgical Care Affiliates*, LLC, No. 3:21-cr-00011 (N.D. Tex.) (filed Jan. 5, 2021). Upon information and belief, Plaintiff alleges that "Company A" refers to USPI.

6.   Plaintiff is a former, senior-level employee of SCA and brings this suit individually and

on behalf of the Proposed Class to recover damages and injunctive relief to prevent Defendants from retaining the benefits of their antitrust violations.

**JURISDICTION AND VENUE**

7.   Plaintiff brings this action on his own behalf as well as that of the Class to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 4 of the Clayton Act (15 U.S.C. § 15(a)), as well as any and all equitable relief afforded them under the federal laws pled herein.

8.   Jurisdiction and venue are proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. § 1391(b), (c) and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more of the Defendants reside in this District or are licensed to do business in this District. Defendants transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District. Defendant SCA has its principal place of business in this District. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

**PARTIES**

9.   Allen Spradling is a resident of Hoover, Alabama. He was employed by Defendant Surgical Care Affiliates, LLC from September 22, 2008 to April 26, 2013, first as a Manager, Program Management Office, and then as a Director, Information Technology.

10. Defendant Surgical Care Affiliates, LLC is a company organized and existing under the laws of Delaware with its principal place of business at 510 Lake Cook Road, Suite 400,

Deerfield, Illinois, 60015. Surgical Care Affiliates, LLC is a wholly owned subsidiary of UnitedHealth Group. Inc.

11. Defendant SCAI Holdings, LLC is a company organized and existing under the laws of Delaware with its principal place of business at 510 Lake Cook Road, Suite 400, Deerfield, Illinois, 60015. SCAI Holdings, LLC is a wholly owned subsidiary of UnitedHealth Group, Inc.

12. Defendant Andrew Hayek is a resident of Illinois. He was President and Chief Executive Officer of SCA from 2008 until 2017. In 2017, he became Chief Executive Officer of OptumHealth. In 2019, he became Executive Vice President of Optum. Upon information and belief, Defendant Hayek is referred to as "Individual 1" in the DOJ indictment.

13. Defendants Surgical Care Affiliates, LLC, SCAI Holdings, LLC, and Andrew Hayek are collectively referred to as "SCA." SCA owns and operates approximately 230 outpatient medical care facilities across the United States and employs approximately 10,000 individuals to operate its business at its headquarters location and at other locations across the United States, serving almost one million patients each year. SCA's mission is to "provid[e] high quality outcomes and a better experience for patients and providers, all at a lower total cost of care." In Fiscal Year 2016, SCA had net operating revenues of approximately $1.2 billion, with $226 million in EBITDA. In 2017, SCA was acquired by United through its subsidiaries for $2.3 billion.

14. Defendant UnitedHealth Group, Inc. ("United") is a company organized and existing under the laws of Delaware, with its principal place of business at 9900 Bren Road East, UnitedHealth Group Center, Minnetonka, MN 55343. Through its subsidiaries, United operates two distinct business platforms: health insurance and health services. In 2020, it was the second-largest healthcare company by revenue with $257.1 billion, and the largest insurance company by Net Premiums. United was ranked 7th on the 2020 Fortune 500 list.

15. Defendant United Surgical Partners Holding Company, Inc. is a company organized and existing under the laws of Delaware with its principal place of business at 14201 Dallas Parkway, Dallas, Texas, 75254. United Surgical Partners Holding Company, Inc. is a wholly owned subsidiary of Defendant Tenet.

16. Defendant United Surgical Partners International, Inc. is a company organized and existing under the laws of Delaware with its principal place of business at 14201 Dallas Parkway, Dallas, Texas, 75254. United Surgical Partners International, Inc. is a wholly owned subsidiary of Defendant Tenet.

17. Defendant Tenet Healthcare Corporation ("Tenet") is a company organized and existing under the laws of Nevada with its principal place of business at 14201 Dallas Parkway, Dallas, Texas 75254. Tenet, through its many subsidiaries, owns and operates outpatient medical facilities throughout the United States. Tenet is a public company traded on the New York Stock Exchange under the symbol "THC." Tenet is the parent corporation of USPI. On June 16, 2015, Tenet completed a transaction that combined its freestanding ambulatory surgery and imaging center assets with the surgical facility assets of USPI. In April 2016, Tenet paid $127 million to purchase additional shares, which increased its ownership interest in USPI from 50.1% to approximately 56.3%. In July 2017, Tenet paid $716 million for the purchase of additional shares, which increased its ownership interest in USPI to 80.0%. In April 2018, Tenet paid approximately $630 million for the purchase of an additional 15% ownership interest in USPI, which increased its ownership interest in USPI to 95%.

18. Defendants United Surgical Partners Holding Company, Inc., United Surgical Partners International, Inc., and Tenet Healthcare Corporation are collectively referred to as "USPI." USPI "is the largest ambulatory surgery platform in the country," owns and operates over 550

outpatient medical facilities and other facilities, employs 110,000 people, partners with approximately 5,000 physicians, and serves 10 million patients annually in 28 states. USPI was "founded with a promise to deliver high-quality, lower-cost solutions for [its] communities."

19. John Does 1-10 are persons and entities that conspired with SCA as described herein. They include, at a minimum, "Company B." The identity of the John Doe Defendants cannot be known without discovery from SCA. Plaintiff will request leave to amend this complaint upon learning the identity of the John Doe Defendants during appropriate discovery.

20. "Company B" is a company organized and existing under the laws of Delaware with its principal place of business in Denver, Colorado. "Company B" owns and operates outpatient medical care facilities across the United States and employs individuals to operate its business at its headquarters location and at other location across the United States.

## GOVERNMENT INVESTIGATION

21. The United States Department of Justice issue a press release on January 7, 2021 confirming the existence of the conspiracy and announcing a criminal indictment against SCA. That indictment references two co-conspirator companies—"Company A" and "Company B." *See Indictment, United States v. Surgical Care Affiliates*, LLC, No. 3:21-cr-00011 (N.D. Tex.) (filed Jan. 5, 2021). Upon information and belief, Plaintiff alleges that "Company A" refers to USPI. The indictment alleges that "Individual 1" also participated in the conspiracy.

## AGENTS AND CO-CONSPIRATORS

22. The anticompetitive and unlawful acts alleged against Defendants in this Class Action Complaint were authorized, ordered or performed by the Defendants' respective officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction, or control of the Defendants' businesses or affairs.

23. The Defendants' agents operated under the explicit and apparent authority of their principals.

24. The Defendants, through their subsidiaries, affiliates and agents operated as a single unified entity.

25. Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof. These include, at a minimum, "Company B" named in the Indictment, which is a company organized and existing under the laws of Delaware with its principal place of business in Denver, Colorado. "Company B" owns and operates outpatient medical care facilities across the United States and employs individuals to operate its business at its headquarters location and at other location across the United States.

26. Each Defendant acted as the principal, agent or joint venture of, or for other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

## INDUSTRY BACKGROUND

27. During the Class Period, medical costs accounted for a substantial percentage of spending in America. The United States spent $2.7 trillion on healthcare in 2011, according to Centers for Medicare and Medicaid Services ("CMS"), and the percentage of gross domestic product devoted to healthcare increased from 7.2% in 1970 to 17.9% in 2011. According to SCA's 2014 SEC filings, surgical delivery was one of the largest components of medical costs in the United States, representing approximately 30% of medical spending for individuals with commercial insurance.

28. At the same time, the healthcare industry was in the midst of a transition characterized by increased focus on cost containment and clinical outcomes, driven by regulatory efforts and new payment and delivery models, such as Accountable Care Organizations ("ACOs").

29. These measures led to an increase in outpatient surgeries. According to the American Hospital Association, from 1991 to 2011, outpatient surgeries increased from 52.3% of total surgery volumes to 64.2%. In addition, a significant share of outpatient surgeries shifted from hospitals to free-standing facilities over a similar period. Advancements in medical technology, such as lasers, arthroscopy, fiber optics and enhanced endoscopic techniques, reduced the trauma of surgery and the amount of recovery time required by patients following certain surgical procedures. Improvements in anesthesia also shortened the recovery time for many patients by minimizing post-operative side effects such as nausea and drowsiness, thereby avoiding, in some cases, overnight hospitalization. These medical advancements significantly increased the number of procedures that could be performed in a surgery center and fueled the migration of surgical procedures out of hospitals and into outpatient settings.

30. The transition to outpatient care led to a consolidation in the market as provider networks sought to buy up competition. In 2015, Tenet purchased a 50.1% stake in USPI and completed its purchase in 2018. The combined company operated 244 ambulatory surgery centers, 16 short-stay surgery hospitals and 20 imaging centers in 29 states. In 2016, Envision merged with AmSurg to create a $10 billion enterprise that owned and operated 260 surgery centers and one surgical hospital in 35 states and the District of Columbia. In 2017, United purchased SCA for $2.3 billion in 2017, creating a network that services about 1 million patients a year across 30 states.

31. These companies dominated the outpatient medical care market and were driven by investors to maximize profit. At the same time, constituents across the healthcare continuum, including government payors, private insurance companies and self-insured employers, implemented cost containment measures. Insurance providers created networks to drive down medical care costs, reimbursing care from only those providers that met cost containment measures. This meant that despite consolidation in the outpatient medical care market, these companies' revenue was constrained by powerful buyers (insurance companies) that limited reimbursements.

32. To increase profits, outpatient medical care centers had incentive to decrease costs at the place with least resistance—employee wages. Since the 1970s, the United States has experienced slow wage growth and rising inequality, a trend that has accelerated over the last fifteen years. Unemployment is at historic lows and job openings are at an all-time high, yet wage growth has remained sluggish and has not kept pace with increased productivity in the labor market.



33. Several factors contribute to this trend, including market concentration of employers and employer collusion. Labor markets are inherently inelastic (unresponsive to changes in price) because employees cannot easily respond to stagnant or decreasing wages. Labor is "an extremely perishable commodity" because "an hour not worked today can never be recovered." Thus, collusion amongst employers is especially effective because employees cannot easily switch to another employer to mitigate the wages already lost. To correct these market inefficiencies, federal and state antitrust enforcers have begun to take particular focus on anticompetitive conduct in labor markets in recent years.

**FACTUAL ALLEGATIONS**

34. Defendants, in an effort to reduce costs, sought to artificially depress employee wages through an anticompetitive conspiracy. Over a period spanning at least the years 2010 through

9

2017, Defendants entered agreements not to solicit senior-level employees. This type of conspiracy is known as a "no-poach" agreement. These no-poach agreements were executed and enforced by the companies' most senior executives. The no-poach agreements suppressed competition for the services of senior-level employees, and were not reasonably necessary to any separate, legitimate business transaction or collaboration among the companies.

35. Defendants participated in meetings, conversations, and communications to discuss the no-poach agreements, and agreed during those meetings, conversations, and communications not to solicit each other's senior-level employees.

36. For example, on or about May 14, 2010, the CEO of USPI emailed other employees of USPI: "I had a conversation w [Defendant Hayek] re people and we reached agreement that we would not approach each other's proactively."

37. On or about October 20, 2014, the CEO of Company B emailed Defendant Hayek the following: "Someone called me to suggest they reach out to your senior biz dev guy for our corresponding spot. I explained I do not do proactive recruiting into your ranks."

38. Defendants told certain executives, employees, and recruiters to avoid soliciting senior-level employees of each other's companies. For example, on or about November 11, 2013, a senior human resources employee at USPI told a recruiter the following: "Please do not schedule a call w/ [candidate], thanks. She would have had to apply for the job first. We cannot reach out to SCA folks. Take any SCA folks off the list."

39. On or about December 12, 2015, SCA's human resources executive instructed a recruiter to "note that [USPI] and [Company B] are off limits to SCA."

40. Defendants told each other's senior-level employees who were candidates for employment at the other companies that they were required to notify their current employer to

10

that effect. For example, on or about November 1, 2013, employees of USPI discussed whether to interview a candidate employed by SCA considering the "verbal agreement with SCA to not poach their folks …." The CEO of USPI disclosed that "[w]e do have that agreement and want to stick by it. If [candidate] indeed did approach us, and is willing to tell Defendant Hayek] that I'm ok." The senior human resources officer at USPI responded: "Yikes, she is not going to want to do that. But I will check."

41. On or about April 26, 2016, SCA's human resources executive emailed a candidate from Company B that she could not recruit from Company B, with the exception of "candidates [who] have been given explicit permission by their employers that they can be considered for employment with us."

42. On or about October 16, 2015, Defendant Hayek emailed a SCA human resources executive: "Putting two companies in italics ([USPI] and [Company B]) - we can recruit junior people (below Director), but our agreement is that we would only speak with senior executives if they have told their boss already that they want to leave and are looking."

43. Defendants alerted their co-conspirators when each other's senior-level employees were recruited, and policed violations of the conspiracy. For example, on or about December 8, 2015, the CEO of USPI informed the Defendant Hayek: "Just wanted to let you know that [recruiting company] is reaching out to a couple of our execs. I'm sure they are not aware of our understanding." Defendant Hayek told other SCA executives: "We should continue to flag [USPI] on our 'do not call' list to recruiters - is [sic] OK if we get an inbound inquiry and the leader has communicated within [USPI] that they want to leave, but outbound calls should not be occurring."

44. On or about June 13, 2016, an employee of SCA forwarded news of a recruitment, noting that: "I thought there was a gentlemen's agreement between us and [Company B] re: poaching talent." An SCA officer replied: "There is. Do you mind if I share with [Defendant Hayek], who has most recently addressed this with [Company B's CEO]." Defendant Hayek relayed the news to Company B's CEO, who replied "Will check it out."

45. Defendants refrained from soliciting each other's senior-level employees. For example, on or about July 17, 2017, a human resources employee of USPI, believing a candidate to be employed by SCA, emailed a recruiting coordinator for USPI that, although the candidate "look[ed] great" she "can't poach her."

46. On or about April 7, 2017, Defendant Hayek was contacted by a consultant regarding his interest in a candidate employed by Company B, and responded: "In order to pursue [candidate], he would need to have already communicated that he is planning to leave [Company B] — that's the relationship that we have with [Company B]." The consultant responded, ". . . I'm glad you arrived at that agreement with [Company B's CEO]."

## CLASS ALLEGATIONS

47. Plaintiff brings this action for damages and injunctive relief on behalf of himself and as a class action pursuant to Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), on behalf of a similarly situated Class, which is defined, as follows:

> All natural persons who worked in senior-level positions in the United States for one or more of the following: (a) from May 1, 2010 to October 31, 2017 for Surgical Care Affiliates, LLC or one of its subsidiary outpatient medical care facilities; (b) from May 1, 2010 to October 31, 2017 for United Surgical Partners Holding Company, Inc., United Surgical Partners International, Inc. or one of its subsidiary outpatient medical care facilities; or (c) from February 1, 2012 to July 31, 2017 for Company B, or one of its subsidiary outpatient medical care facilities (the "Class Period").

This definition specifically excludes the following person or entities:

a.  Any of the Defendants named herein;

b.  Any of the Defendants' co-conspirators;

c.  Any of Defendants' parent companies, subsidiaries, and affiliates;

d.  Any of Defendants' senior corporate officers, including Chief Executive Officers, Chief Financial Officer, or Chief Operating Officer;

e.  All governmental entities;

f.  The judges and chambers staff in this case, as well as any members of their immediate families; and

g.  Senior corporate officers and personnel in the human resources, recruiting, and legal departments of SCA, USPI, or Company B.

48. Based on the Indictment, the term "senior-level" as used throughout this complaint and in the proposed Class Definition includes, at a minimum, those with the title of Director or higher, as well as the top administrators at each outpatient medical care facility, such as Chief Nursing Officers. The term does not include the senior corporate officers of each Defendant.

49. Plaintiff does not know the exact number of Class members, because such information is in the exclusive control of Defendants. Plaintiff is informed and believes that, due to the nature of the trade and commerce involved, there are thousands of Class members geographically dispersed throughout the United States and elsewhere, such that joinder of all Class members in the prosecution of this action is impracticable.

50. Plaintiff's claims are typical of the claims of his fellow Class members because Plaintiff was employed by SCA as a senior-level employee during the Class Period, Plaintiff and all Class members were damaged by the same wrongful conduct of Defendants as alleged herein, and the relief sought herein is common to all members of the Class.

51. Numerous questions of law or fact common to the entire Class—including, but not limited to those identified below—arise from Defendants' anticompetitive and unlawful conduct:

a.  Whether Defendants agreed not to solicit or hire each other's senior-level employees;

13

b. Whether such agreements were *per se* violations of the Sherman Act;

c. Whether Defendants have fraudulently concealed their misconduct;

d. Whether and the extent to which Defendants' conduct suppressed compensation below competitive levels for their senior-level employees;

e. Whether Plaintiff and the Class suffered antitrust injury because of Defendants' agreements; and

f. The type and measure of damages suffered by Plaintiff and the Class.

52. These and other questions of law and fact are common to the Class and predominate over any questions affecting the Class members individually.

53. Plaintiff will fairly and adequately represent the interests of the Class because he was employed by SCA as a senior-level employee during the Class Period and does not have conflicts with any other members of the Class. Furthermore, Plaintiff has retained sophisticated and competent counsel who is experienced in prosecuting no-poach class actions, as well as price-fixing and other complex litigation.

54. Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

55. This class action is superior to alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecuting the claims pled herein as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

56. The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## ANTICOMPETITIVE EFFECTS AND LACK OF PROCOMPETITIVE JUSTIFICATION

57. The conspiracy substantially reduced competition for labor. Defendants and the unnamed co-conspirators entered, implemented and policed these agreements with the knowledge of the

overall conspiracy, and did so with the intent and effect of fixing, restraining and stabilizing the compensation paid to their personnel at artificially low levels.

58. Defendants adhered to a policy of internal equity. Internal equity is the comparison of positions within a business under which businesses generally compensate workers of similar title and job descriptions equivalently. Under application of principles of internal equity, changes in compensation will be experienced broadly across an organization. The conspiracy reduced competition across the employees of Defendants and their co-conspirator firms such that compensation and mobility was decreased broadly across them.

59. The harm not only reached individuals who sought to change their employment from one company to another, but also extended to those who had no intention of changing companies, due to, *inter alia*, the Defendants' efforts to maintain internal equity in their compensation structures, as well as the reduction of transparency.

60. The conspiracy constitutes a *per se* violation of the Sherman Act because there were naked restraints on trade that lacked any redeeming virtue.

61. In the alternative, Defendants are liable under a "quick look" analysis where one with even a rudimentary understanding of economics could conclude that the arrangements and agreements alleged would have an anticompetitive effect on class members and markets.

62. In the alternative, Defendants are liable under a "rule of reason" analysis because they exploited their collective market power in the market for senior-level employees in outpatient medical care facilities in the United States and there are no procompetitive effects.

63. Even if there were purported procompetitive effects—which there are not—these effects could be achieved by less restrictive alternatives and are outweighed by the anticompetitive harm. For example, in many states, employers can use non-compete clauses to protect investments they have made in senior-level employees. Unlike employee noncompete clauses, employer no-poach agreements operate at the employer level, and employees are not parties to such agreements or necessarily aware of them, although they can limit their opportunities. No-poach agreements, therefore, may cause employees to stay with the company longer than they

15

otherwise would have under the false belief that they are being turned away from other jobs due to their lack of qualifications.

64. In addition, any procompetitive effects that may have resulted from the conspiracy and/or the conduct of Defendants and their agents and coconspirators in furtherance thereof were and are outweighed by the anticompetitive harm alleged herein, including but not limited to restricting employee mobility and suppressing wages, benefits and other aspects of compensation.

## MARKET DEFINITION AND MARKET POWER

65. While the theory of labor supply and demand proves somewhat useful to describe the interaction between workers offering their skills and employers looking to fill spots- and the concurrent determination of wages, economists have argued that due to so-called market imperfections, special emphasis needs to be placed in firms' potential monopsony power, search costs, training and human capital investments and geographical mobility.

66. In general, the labor market is the overarching term that economists use for all the different markets for labor, maintaining that there is no single labor market but rather different ones for every different type of labor that share certain similarities. For example, labor differs by type of work, skill level, and location but is similar in that wages tend to be "sticky" (they do not change much throughout a worker's lifetime), almost never go down, and workers tend to be paid progressively more for more years of education and training. While each labor market is different, they all tend to operate in similar ways and are heavily related to the state of the economy in general. For example, when wages go up in one labor market, they tend to go up in others too.

67. In a perfectly competitive labor market, the supply and demand for jobs meet at an equilibrium price (i.e. wage), with the workers providing the services that employers demand. The worker offers her services for compensation while the employer needs an individual to do a specific job or to complete a task. The worker is then comparable to a seller while the employer is the buyer. A common factor that connects the two entities is the salary or wage that is agreed

to be received by the worker from the employer. Through the labor market, workers can find work that suits their skills and qualifications, and where both agree on the wages, benefits, and other forms of compensation.

68. With perfect competition and labor mobility, it is assumed that workers move to where there is a demand for their skills, whether this is in their local region or abroad. Moreover, workers are also replaceable, which means that a person who can do the job better can be employed to take over the other worker's job. Furthermore, salaries are not fixed, meaning they can go up or down, and are dependent on the worker's performance, education level and skills. Compensation, including wages, is the highest motivating factor in the labor market. Labor markets are an integral part of an organization's recruitment process because it not only helps it find the most qualified workers for the jobs that it offers but also ensures that it provides a competitive compensation package to its workers. This is important for an organization to be able to keep its competent workers and, thus, continue its productivity.

69. When labor markets operate competitively, employers pay the value of the workers marginal productivity to the firm. Workers benefit from this process by obtaining the highest compensation for their skills and training.



70. In a perfectly competitive labor market, both firms can hire all the labor they want at the going market wage. Therefore, the total amount of workers employed is $L_1$ where the going market wage equals the value of the marginal product of labor. The equilibrium wage and employment level are determined where the market demand for labor equals the market supply of labor.



71. When the labor market has imperfect competition, employers can gain monopsony power—the ability to offer lower than competitive wages—as bargaining power moves away from the workforce into the hands of employers. This transfer of power causes depressed wages, as employers are not required by competitive market conditions to offer wages at the value of the marginal product of labor.



72. Training, education, and experience are some of the most important determinants of wage and are crucial for a worker when negotiating better employment conditions and higher compensation. No poach agreements suppress a worker's fundamental right to seek better employment terms once they have acquired new skills. Through these agreements, employers can pay less than competitive wages.

73. The relevant geographic market is the United States. Defendants own and operate outpatient medical care facilities nationally and compete nationwide for a workforce to staff their businesses. Due to licensing restrictions, language barriers, and low international job mobility, Defendants do not meaningfully compete in the international labor market.

74. The relevant product market is senior-level employees working at outpatient medical care facilities. The product market is limited to senior-level employees because they have the training, education, and experience to compete for the jobs impacted by Defendants' no-poach agreements. The product market is limited to outpatient medical care facilities because these facilities differ from other medical care facilities. First, outpatient medical care facilities perform medical care that does not require an overnight stay at the facility. By contrast, inpatient facilities such as hospitals allow a patient to spend the night. Second, the procedures are less complex- and therefore, the expertise necessary to treat the patient population differs. Third, employees at outpatient medical care facilities have better work-life balance, as they are not required to work overnight or be on call. This attracts workers who are willing to forgo increased pay in favor of a more flexible 9 to 5 schedule. Fourth, inpatient medical care facilities are generally smaller, attracting employees that want to know all their co-workers. Fifth, inpatient medical facilities are more specialized, and attract employees that have particularized knowledge and do not need the wide range of experiences and opportunities that inpatient medical care facilities can provide.

75. Defendants had monopoly power in the market for outpatient medical care facilities. Defendants operated, and continue to operate, the largest networks of outpatient medical care facilities in the United States. SCA employs 10,000 workers, owns and operates more than 230 surgical care facilities, and serves nearly 1 million patients per year. USPI owns and operates

over 400 ambulatory facilities serving 9,000 physicians and 3.4 million patients annually in 28 states.

## EFFECTS ON INTERSTATE COMMERCE

76. During the Class Period, Defendants employed members of the Class throughout the United States.

77. Defendants' conspiracy substantially reduced competition in the labor market for senior-level professionals in outpatient medical care facilities in the United States and suppressed the efficient movement and compensation of senior-level professionals in outpatient medical care facilities in the United States, harming Plaintiff and members of the Class. The harm extended not only to those who did or would otherwise have sought to change companies- but also to those who had no intention of seeking other employment because the no-poach agreements enabled Defendants to maintain suppressed compensation levels generally.

78. Thus, Defendants' no-poach agreements and related conduct substantially affected the interstate labor market for senior-level professionals in outpatient medical care facilities in the United States and caused antitrust injury throughout the United States.

## STATUTE OF LIMITATIONS AND TOLLING

79. During the Class Period, Defendants concealed their conspiracy, such that Plaintiff and Class members could not have discovered it through the exercise of reasonable diligence.

80. Until the DOJ announced its criminal indictment on January 7, 2021, Plaintiff and Class members did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendants were conspiring to restrain competition for the services of their senior-level employees. Nor did Plaintiff have any reason to suspect that Defendants were illegally acting in concert to suppress wages and the labor market. At no point did Defendants inform Plaintiff that his compensation was not competitive but was instead suppressed by Defendants' anticompetitive agreements.

81. Conspiracies, by their nature, must be concealed. To keep the conspiracy hidden from

those it affected most—employees and prospective employees—Defendants and their co-conspirators did not publicize their no-poach agreements. Defendants also did not inform employees of the conspiracy during the application process or the new employee onboarding process.

82. Defendants also concealed the conspiracy by giving false and pretextual explanations for hiring and compensation decisions, including that the decisions were based on merit, the operation of free and open competition, and other considerations, instead of pursuant to an unlawful agreement.

83. For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule, the doctrine of equitable tolling, and/or Defendants' fraudulent concealment. Defendants are thus estopped from relying on any statute of limitation in defense of this action.

## CLAIM FOR RELIEF

### COUNT 1
### Restraint of Trade in Violation of Section 1 of the Sherman Act
### (15 U.S.C. § 1)

84. Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this Complaint, and further alleges the following:

85. Beginning no later than May 1, 2010, and continuing until at least October 31, 2017, Defendants entered into and engaged in an unlawful agreements in restraint of trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

86. Specifically, in or around May 1, 2010, Defendants Surgical Care Affiliates, LLC, and/or SCAI Holdings, LLC, and Defendants United Surgical Partners Holding Company, Inc. and/or United Surgical Partners International, Inc. entered into a no-poach agreement.

87. In or around February 1, 2012, Defendants Surgical Care Affiliates, LLC, and/or SCAI Holdings, LLC and Company B entered into a no-poach agreement.

88. Defendant Andrew Hayek directly participated in, or knowingly ratified or approved of the no-poach agreements. The acts committed by Hayek, and the anticompetitive conduct charged herein, are inherently wrongful, and subject to criminal liability under Section 1 of the

Sherman Act, 15 U.S.C. § 1.

89. Defendant UnitedHealth Group, Inc. either knowingly participated in or ratified the no-poach agreements, or assumed the liabilities of Defendants Surgical Care Affiliates, LLC, and SCAI Holdings, LLC, through its acquisition.

90. Defendant Tenet Healthcare Corporation either knowingly participated in or ratified the no-poach agreements, or assumed the liabilities of Defendants United Surgical Partners Holding Company, Inc. and United Surgical Partners International, Inc. through its acquisition.

91. Defendants' agreement included concerted actions and undertakings among themselves and their co-conspirators with the purpose and effect of: (a) fixing, reducing and stabilizing the wages, benefits and other aspects of compensation of Plaintiff and the Class at artificially low levels; and (b) eliminating, to a substantial degree, competition among Defendants for labor.

92. As a direct and proximate result of Defendants' combination and contract to restrain trade and eliminate competition for labor, Plaintiff and members of the Class have suffered injury and have been deprived of the benefits of free and fair competition on the merits.

93. The unlawful agreement among Defendants and their co-conspirators has had the following effects, among others:

    a.  competition among Defendants for labor has been suppressed, restrained, and eliminated; and

    b.  Plaintiff and Class members have received lower compensation from Defendants than they otherwise would have received in the absence of the Conspiracy and, as a result, have been injured in their property and have suffered damages in an amount subject to proof at trial.

94. The acts done by each Defendant as part of, and in furtherance of, their contract, combination, and/or conspiracy was authorized, ordered, or committed by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of each Defendant's affairs.

95. Defendants' contract, combination, and/or conspiracy is a *per se* violation of Section 1 of

22

the Sherman Act.

96. Accordingly, Plaintiff and Class members are entitled to three times their damages caused by Defendants' violations of Section 1 of the Sherman Act, as well as the costs of bringing suit, reasonable attorneys' fees, and a permanent injunction prohibiting Defendants from ever again entering into similar agreements in violation of the antitrust laws.

## DEMAND FOR JURY TRIAL

97. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff, on behalf of himself and the Class, demands a jury trial as to all issues triable by a jury.

## PRAYER FOR RELIEF

98. WHEREFORE, Plaintiff prays that this Court enter judgment on his behalf and that of the Class by adjudging and decreeing that:

    a. This action may be maintained as a class action, with Plaintiff as the designated Class representative and his counsel as Class counsel;

    b. Defendants have engaged in trusts, contracts, combinations, or conspiracies in violation of Section 1 of the Sherman Act, and that Plaintiff and the Class members have been damaged and injured in their business and property as a result of these violations;

    c. The alleged conspiracy are *per se* violations of the Sherman Act;

    d. Defendants are enjoined from attempting to enter into, entering into, maintaining, or enforcing any no-poach agreement, or other illegal anticompetitive agreement or understanding, as alleged herein;

    e. Judgment be entered for Plaintiff and Class members against Defendants, for three times the amount of damages sustained by Plaintiff and the Class, as allowed by law;

    f. Plaintiff and the Class recover pre-judgment and post-judgment interest as permitted by law;

g.   Plaintiff and the Class recover their costs of suit, including attorneys' fees, as

provided by law; and

h.   Plaintiff and the Class are entitled to such other and further relief as is just and

proper under the circumstances.

Dated: March 9, 2021                    By: /s/ Douglas A. Millen

Douglas A. Millen
William H. London
Michael E. Moskovitz
**FREED KANNER LONDON & MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Tel: (224) 632-4500
Fax: (224) 632-4521
dmillen@fklmlaw.com
blondon@fklmlaw.com
mmoskovitz@fklmlaw.com

Joseph R. Saveri (admitted under L.R. 83.10)
Steven N. Williams (*pro hac vice* forthcoming)
Chris K.L. Young (*pro hac vice* forthcoming)
Kyle P. Quackenbush (*pro hac vice* forthcoming)
Anupama K. Reddy (*pro hac vice* forthcoming)
**JOSEPH SAVERI LAW FIRM, INC.**
601 California Street, Suite 1000
San Francisco, California 94108
Tel:  (415) 500-6800
Fax:   (415) 395-9940
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
cyoung@saverilawfirm.com
kquackenbush@saverilawfirm.com
areddy@saverilawfirm.com

Ashley Keller
Travis Lenkner
Jason A. Zweig
**KELLER LENKNER LLC**
150 N. Riverside Plaza, Suite 4270
Chicago, IL 60606
Tel: 312.741.5220
ack@kellerlenkner.com
tdl@kellerlenkner.com

jaz@kellerlenkner.com

Kimberly A. Justice (*pro hac vice* forthcoming)
**FREED KANNER LONDON & MILLEN LLC**
923 Fayette Street
Conshohocken, PA 19428
Tel: (610) 234-6770
Fax: (224) 632-4521
kjustice@fklmlaw.com

*Counsel for Individual and Representative Plaintiff*
*Allen Spradling*